■ SHERI A. NABOZNY et al., Appellants, v RICHARD CAPPELLETTI, Respondent. [699 NYS2d 589] —Carpinello, J. Appeals (1) from a judgment of the Supreme Court (Cobb, J.), entered May 19, 1998 in Columbia County, upon a verdict rendered in favor of defendant, and (2) from an order of said court, entered January 14, 1999 in Columbia County, which, *inter alia*, denied plaintiffs' motion to strike defendant's answer or, in the alternative, for a new trial.

On January 13, 1987, plaintiff Sheri A. Nabozny (hereinafter plaintiff) injured her left ankle after a fall at work. She treated with defendant, a vascular surgeon, on January 30, 1987 for a sprain and saw him again on three occasions in February 1987 (twice in his office and once at the emergency room) for the injury. On March 1, 1987 and March 5, 1987, respectively, she went to the emergency room with continued complaints of pain. During the March 1, 1987 emergency room visit, plaintiff was seen by another physician who diagnosed her with a soft tissue injury. On the March 5, 1987 visit, defendant examined plaintiff and found that her left foot had increased swelling and was tender to the touch, that her toes were black and blue and that she had a markedly positive Homan's sign (i.e., she had tenderness and pain on dorsiflex).

Defendant diagnosed her with a deep vein thrombophlebitis of the left foot—i.e, a blood clot in the vein which, if untreated, could result in a pulmonary embolism and death—and admitted her to Columbia-Greene Medical Center. Although plaintiff remained in the hospital until April 14, 1987, her care was transferred to Markandu Thambirajah, a family practitioner, as of April 8, 1987. During the period of time that defendant

treated plaintiff in the hospital, he prescribed bed rest and intermittent heparin therapy to stop the clotting process. It is undisputed that plaintiff did not respond to the heparin and continued to be in significant pain while under defendant's care. She was eventually diagnosed with reflex sympathetic dystrophy[1] and peroneal nerve palsy secondary to prolonged bed rest and compression of the left fibular head.

The instant medical malpractice action commenced by plaintiff and her husband, derivatively, concerns defendant's treatment from March 5, 1987 to April 8, 1987. They claim that defendant failed to order diagnostic tests to confirm his diagnosis of deep vein thrombophlebitis and failed to timely recognize and treat plaintiff's reflex sympathetic dystrophy, which caused plaintiff to develop peroneal nerve atrophy and reduced her chance of a complete recovery. A jury found in favor of defendant, prompting this appeal.

The primary controversy on appeal involves a venogram X-ray performed on plaintiff as ordered by another physician on April 23, 1987 and the circumstances surrounding its ultimate disclosure to plaintiffs. At certain points in the litigation, defense counsel had obtained copies of the venogram, but lost them. As of the commencement of trial in Supreme Court, neither party had a copy of the actual film itself in their possession, both sides being under the impression that Columbia-Greene had by that time destroyed the decade-old X-ray. Both sides, however, had a copy of the venogram *report*, which noted that there was an "incomplete visualization of the deep veins in the patient's left calf" but nonetheless concluded that plaintiff had a deep vein thrombophlebitis in the left calf region. On the morning of the last day of plaintiff's case, defendant personally phoned the radiology department of Columbia-Greene and discovered that the venogram film did in fact still exist. Unfortunately, the existence of the venogram film was not immediately disclosed to plaintiffs' counsel, who rested before the court at midday. That afternoon, defense counsel issued a subpoena for the film, obtained it and ultimately introduced it into evidence during defendant's case over plaintiffs' objection.

Plaintiffs claim that defendant's failure to disclose the April 23, 1987 venogram film warrants the striking of his answer

---

1. Reflex sympathetic dystrophy was defined by one medical witness as "a disturbance of the part of the nervous system that regulates the distribution of blood and the skin" following a minor or major injury. Another described it as a disease of the brain that occurs after trauma of an extremity. It is generally treated with a sympathetic nerve block and physical therapy.

pursuant to CPLR 3126 (3) or, alternatively, a new trial in the interest of justice. A court may strike the "pleadings or parts thereof" as a sanction against a party who "refuses to obey an order for disclosure or wilfully fails to disclose information which the court finds ought to have been disclosed" (CPLR 3126). The nature and degree of any penalty imposed on a motion pursuant to CPLR 3126 is a discretionary matter (*see, e.g., Soto v City of Long Beach*, 197 AD2d 615, 616; *Spira v Antoine*, 191 AD2d 219), and "striking an answer is inappropriate absent a clear showing that the failure to comply with discovery demands is willful, contumacious, or in bad faith" (*Harris v City of New York*, 211 AD2d 663, 664; *see, Forman v Jamesway Corp.*, 175 AD2d 514). Our review of the record, particularly the thorough proceedings conducted by Supreme Court outside the presence of the jury during which all of the circumstances surrounding the belated production of the venogram were fully explored, leads to the conclusion that the court did not improvidently exercise its discretion in declining to strike defendant's answer.

First, and foremost, plaintiffs did not meet their burden of coming forward with a "clear-cut showing" (*Forman v Jamesway Corp., supra*, at 515) that defendant willfully or contumaciously failed to disclose the subject venogram to them during pretrial discovery (*cf., Lawrence H. Morse, Inc. v Anson*, 251 AD2d 722; *Pimental v City of New York*, 246 AD2d 467, 468). While plaintiffs' counsel did specifically request medical records, including X-ray films, from Columbia-Greene on two occasions during this protracted litigation (in July 1988 and April 1989), the hospital failed to provide copies of the April 23, 1987 venogram. When plaintiffs' counsel made a specific request for six unrelated X-ray films in October 1997 (the April 23, 1987 venogram not being one of the requested films), he was informed by Columbia-Greene that all 1987 and 1988 X rays had been discarded. In addition, notwithstanding an agreement that defense counsel would forward all reports and documents obtained through use of plaintiff's medical authorization, defense counsel never forwarded copies of the venogram to plaintiffs' counsel during the time periods when copies were in their possession and subsequently lost. In sum, all counsel proceeded to trial believing that the original venogram film had been discarded, neither side then having a copy in their possession.

Although plaintiffs attempt to make much of the fact that defendant served as Columbia-Greene's medical director from 1994 to 1998, they have not demonstrated that, in this capac-

ity, he was in any way responsible for the *hospital's* failure to produce the venogram or the misinformation that all 1987 X-rays were destroyed (indeed, defendant did not even hold this position when the only two requests regarding the subject venogram were actually made by plaintiffs). There was simply no showing that, during pretrial discovery, "defendant was guilty of a deliberately evasive, misleading and uncooperative course of conduct or a determined strategy of delay that would be deserving of the most vehement condemnation" (*Forman v Jamesway Corp., supra,* at 515). To the contrary, the record reveals that the subject venogram, along with other medical records generated in the radiology department, were transferred by the hospital to its risk management department in 1990—due to plaintiffs' lawsuit against Columbia-Greene—and remained there until 1996 when they were sent back to radiology. At this point, they were then sent to a warehouse facility where they were stored until defendant's May 5, 1998 inquiry to the radiology department revealed their existence.

Nor do we find that willfulness "can be inferred from the circumstances surrounding the failure to disclose" (*Wolford v Cerrone,* 184 AD2d 833). While defense counsel had obtained copies of the venogram film from Columbia-Greene in 1989 and 1996, respectively, they lost them during the course of the litigation. The mere loss of a record, while perhaps careless, does not, without more, establish *willful* or *contumacious* conduct (*cf., id.; Henderson v Stilwell,* 116 AD2d 861, 863, *lv denied* 68 NY2d 606; *see also, Brandi v Chan,* 151 AD2d 853, *appeal dismissed* 75 NY2d 789). We note that the original film itself had been provided to plaintiff's treating physicians in the past, including Thambirajah and Robert Leather (a vascular surgeon who treated plaintiff between July 1987 and September 1994), and each physician testified on plaintiff's behalf at trial.

More troublesome is defense counsel's conduct on the day of trial that the continued existence of the film was discovered. While it would have been better practice to immediately notify Supreme Court and plaintiffs' counsel of the existence of the venogram—instead of waiting for plaintiffs to rest their case—we find that under the facts of this case, the failure to so notify does not require the striking of defendant's answer, nor warrant a new trial. In an attempt to establish that each of these remedies is appropriate, plaintiffs claim that, had they been aware of the existence of the X-ray during their case-in-chief, each of their four medical witnesses could have been questioned using the X-ray itself, as opposed to the radiologist's interpretation of it. This argument, while perhaps facially appealing, does not withstand scrutiny for several reasons.

First, from a procedural standpoint, the fact that the venogram still existed was not discovered until the last day of plaintiffs' case; thus, even assuming a more timely notification by defense counsel, a recall of witnesses would have been required in any event. Moreover, Supreme Court appropriately permitted plaintiffs to present rebuttal evidence respecting the venogram and, contrary to plaintiffs' contentions on appeal, there is no indication in the record that such rebuttal was unduly limited or restricted by the court.[2] Perhaps more importantly, the jury itself was educated about the circumstances surrounding the belated discovery of the film, thereby ameliorating any possible negative connotations against plaintiffs for not using it during their case-in-chief.

From a more substantive standpoint, a close analysis of the nature of plaintiffs' claims of negligence against defendant indicates that the April 23, 1987 venogram is of marginal relevance in any event. According to Myron Fribush, a family practitioner who testified as a medical expert on behalf of plaintiffs, defendant's malpractice was his failure to perform *any* diagnostic tests to determine if plaintiff actually had a deep vein thrombophlebitis and his failure to appropriately monitor the therapeutic effect of the heparin treatment and reconsider his diagnosis and/or modify his treatment (i.e., recognize and appropriately treat the reflex sympathetic dystrophy) when it became apparent that it was not working (i.e., when plaintiff did not respond to heparin therapy within 72 hours).[3] These departures, according to Fribush, caused plaintiff to develop peroneal nerve atrophy and reduced the possibility of a positive outcome following treatment for reflex sympathetic dystrophy.

None of Fribush's opinions—which are all based on defendant's conduct and perceived omissions occurring between March 5, 1987 and April 8, 1987—could be legitimately affected by the results of a venogram ordered by another physician two weeks *after* defendant stopped treating plaintiff. Said differently, while evidence tending to prove or disprove the

2. Simply stated, the record does not bear out plaintiffs' contention that they "were severely restricted with regard to the [rebuttal] evidence which was permitted relative to the missing X-rays and the medical facts and medical conclusions which could be drawn therefrom". To the contrary, Supreme Court, over defense counsel's objections, made it clear that plaintiffs would be permitted to present rebuttal evidence involving the venogram.

3. Indeed, according to Fribush, plaintiff's reflex sympathetic dystrophy was recognizable as of March 5, 1987 and should have actually been considered, at the latest, within 72 hours of the unsuccessful heparin treatment.

presence of a deep vein thrombophlebitis may have been important to each side, it was not dispositive of the issue of the failure to perform *any* diagnostic tests or reconsider treatment during the March 5, 1987 to April 8, 1987 period (i.e., the April 23, 1987 venogram itself does not change the fact that defendant did not order any diagnostic tests of his own or diagnose plaintiff's reflex sympathetic dystrophy).

Moreover, plaintiff's ability to argue that she never had a deep vein thrombophlebitis was not dependent on the existence—or nonexistence—of the film itself. Leather testified that he conducted a duplex study on plaintiff and that the results were normal. According to Leather, although a venogram was an accepted standard for diagnosing deep vein thrombophlebitis in 1987, a duplex study was the best diagnostic tool for determining this condition. Thus, the results of the April 23, 1987 venogram notwithstanding, Leather opined that plaintiff never had a deep vein thrombophlebitis. On rebuttal, John Phelan, a general and vascular surgeon, testified that he examined the venogram film following its discovery during trial. According to Phelan, it did *not* confirm the diagnosis of a deep vein thrombophlebitis. Thus, plaintiff's position that she never suffered from a deep vein thrombophlebitis was the same both before and after the discovery of the film. For all these reasons, we conclude that Supreme Court did not abuse its ample discretion in refusing to strike defendant's answer, nor have plaintiffs demonstrated prejudice so great as to warrant a new trial in the interest of justice.

As a final matter, while defendant, and his experts, acknowledge that plaintiff sustained peroneal nerve palsy as a result of prolonged bed rest, he clearly disputed that this injury was a consequence of improper medical care or treatment on his part. In contrast, Fribush testified that defendant's alleged departures of care *caused* plaintiff to develop peroneal nerve atrophy. Notably, the jury determined that defendant was not negligent in his care and treatment of plaintiff. This being the case, there was certainly a basis upon which the jury could also determine that plaintiff's peroneal nerve palsy was not attributable to any deviation from accepted standards of medical care on defendant's part (*see, e.g., Calandrillo v East Nassau Med. Group*, 186 AD2d 703). Indeed, "a bad result does not, ipso facto, support a claim for medical malpractice" (*Schoch v Dougherty*, 122 AD2d 467, 468, *lv denied* 69 NY2d 605).

Plaintiffs' remaining contentions have been reviewed and rejected as without merit.

Crew III, J. P., Spain, Graffeo and Mugglin, JJ., concur.

Ordered that the judgment and order are affirmed, without costs.